**FILED**

2013 DEC -9 P 4:17

US DISTRICT COURT
HARTFORD CT

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO. 3:13CR**224**(RNC) |
| v. | VIOLATION: |
| JOSEPH EDWARD WAESCHE IV | 18 U.S.C. § 371 (Conspiracy) |

<u>INFORMATION</u>

The Acting United States Attorney charges:

<u>COUNT ONE</u>
(Conspiracy)

<u>The Defendant and Relevant Entities</u>

At all times relevant, unless otherwise specified:

1.      The Subject Entities were a group of related businesses operating principally from Simsbury, Connecticut (the "Simsbury Office"), and/or Stamford, Connecticut (the "Stamford Office"), that were primarily engaged in the business of, among other things, designing, installing, marketing, selling, and administering employee welfare benefit plans.

2.      The defendant JOSEPH EDWARD WAESCHE ("WAESCHE") was an insurance agent licensed by the State of Connecticut to sell life insurance.  WAESCHE worked for and on behalf of the Subject Entities. WAESCHE maintained his primary place of business at the Stamford Office, but interacted frequently with employees at both locations.

3.      Lincoln National Corporation ("Lincoln"), The Phoenix Companies ("Phoenix"), and The Penn Mutual Insurance Company ("Penn Mutual"), along with their subsidiaries, related entities, and affiliates (collectively the "Life Insurance Providers" or "Providers"), issued life insurance policies on individuals' lives in reliance on material misrepresentations knowingly made by WAESCHE and other co-conspirators not named in this Information, and were

financially harmed in issuing such policies.

Background Regarding Life Insurance Policies

4.      A life insurance policy is a contract between a life insurance company and a policy owner and/or insured.  A policy normally requires the insurance company to pay a sum of money to the insured's beneficiary, who is often a relative of the insured, upon the insured's death. This sum of money is commonly referred to as the "death benefit."  To put in force and maintain the validity of a policy, the insured usually makes periodic payments, known as premiums, to the insurance company throughout the policy period.

5.      At all times relevant to this Information, the Life Insurance Providers took the position that the death benefit – the amount paid to beneficiaries upon the death of the insured – should correspond to the amount of money that an insured's dependents or heirs would need in the event of the insured's death. Typically, this amount was derived from, among other things, the insured's lost income and/or estate taxes and expenses that the insured's dependents and heirs would be expected to realize after an insured's death. Accordingly, Providers relied upon the representations regarding an insured's financial condition, income, and other life insurance coverage in force when determining the maximum policy amount (i.e., death benefit) that the Providers would offer on an insured's life.

6.      The first two years of a life insurance policy are referred to as the "contestable period," or the "contestability period."   If an insured dies within the contestable period, the Provider may challenge the policy – and refuse to pay the death benefit – based upon the existence of misrepresentations and/or fraudulent statements in the policy's origination. Afterwards, the grounds for challenging a policy are more limited.

2

7. Universal life policies are one of several types of life insurance policies offered by life insurance companies, including the Life Insurance Providers. As with other types of life insurance policies, a universal life policy provides a death benefit to the insured's beneficiaries and requires premium payments to the insurance companies. At all times relevant to this Information, a defining feature of the universal life policies offered by the Providers was that the insured typically had the option of paying additional premium amounts above the amount required to keep the policy valid. Any amount paid in excess of the required premium becomes a policy's cash value. A policy's cash value earns interest and can be used to satisfy future premium payments. The interest accrues on a tax-deferred basis. The Providers also generally benefited from the investment profits and realized increased cash flow generated by excess premium payments.

Background on Life Settlements and "Stranger Originated Life Insurance"

8. In recent years, a derivative market for life insurance has developed in which existing life insurance policies are sold to third parties who lack an insurable interest in the life of the insured. Typically referred to as a "life settlement" or "senior settlement," these sales are normally lawful, assuming that the policy was procured for legitimate purposes and that there was an insurable interest at the policy's inception. An example of a circumstance in which a policyholder may choose to sell a policy is an unforeseen life event that necessitates the current use of funds paid into a policy or the inability to continue to pay premiums to keep the policy in force. A "viatical" or "viatical settlement" is a life settlement where typically the insured is terminally ill.

9. An "insurable interest" is defined as an interest in the continued life of the insured individual. A person is considered to have an insurable interest in another when, at the time of

policy issuance, that person is in a position where he or she hopes for the continued life of the insured, will be damaged by the insured's death, and thus uses the policy proceeds to mitigate that damage. Where that particular relationship is lacking, and the person to be initially benefitted by the policy is interested in the death rather than the life of the insured, such policy is considered to lack an insurable interest.

10.    As this derivative market has developed, some have sought life insurance policies not for legitimate insurance needs, but rather with the intent that investors, or others lacking an insurable interest, will obtain ownership of the policies. Policies procured under these circumstances have become known as stranger-originated life insurance ("STOLI") policies or investor-originated life insurance ("IOLI") policies (herein referred to collectively as STOLI policies). At all times relevant to this Information, it was the practice of the Life Insurance Providers to deny an application for a universal life insurance policy if the policy holder intended, from the outset, to resell the policy, or if the policy holder financed the policy through an investor whose ultimate intent was to take over ownership of the policy.

11.    In a typical prohibited STOLI transaction, the STOLI investor or its representative induces a prospective insured, often a senior citizen, to purchase a life insurance policy that he or she likely would not otherwise have purchased. The prospective insured applies for the policy with a prior understanding to cede control of the policy (or of the trust owning the policy) to the investor. The prospective insured and the investor agree that, at the end of a given period, ownership of the policy will be transferred to the investor, or some other third party, who would expect to receive the death benefit when the insured dies. The policy is often initially owned by a trust or other entity established by the insured for the benefit of a third party beneficiary.

12.     The investor may arrange financing of the premiums during the time the initial policy holder owns the policy by means of non-recourse premium financing; that is, the only collateral for the loan is the insurance policy itself. When the policy is transferred, the loan may be forgiven in return for control over the policy. Indeed, STOLI arrangements may be marketed as "free insurance," because during the period prior to transfer of the policy, the insured has life insurance protection, paid for with a loan that will not have to be repaid if the policy is ultimately transferred. The understanding between the investor and the insured often calls for the transfer of ownership at the end of the two-year contestable period. As a result, the Life Insurance Providers use the existence of non-recourse premium financing as one indicator of a STOLI policy.

13.     The Life Insurance Providers took several steps to prevent the issuance of STOLI policies because, among other things, such policies caused a discrepancy between the benefits reasonably anticipated by the Providers and the actual benefits received. To ensure that STOLI policies were not issued, the Providers, among other things, requested and then relied on representations from insurance agents and applicants regarding:

a.     the insured's financial information;

b.     the insured and/or policy owner's intent to resell the policy, or discussions regarding the possibility of resale;

c.     the existence of third-party payment of premiums;

d.     the purpose of procuring the policy;

e.     the performance of life expectancy evaluations on applicants; and

f.     the existence of other life insurance policies or pending applications for policies.

14. The facts underlying these representations made by and on behalf of the applicants were essential elements of the agreements between the Life Insurance Providers and insureds and/or policy owners. An insured's financial condition, an insured and/or owner's intent to resell a policy, third-party financing of premiums, outside life expectancy reports, the purpose of the policy, and the existence of other life insurance applications and policies significantly informed the Life Insurance Providers' financial expectations with respect to universal life policies. Accordingly, where Life Insurance Providers were deceived into issuing a universal life policy based on misrepresentations and/or fraudulent statements regarding the above-referenced factors, the Providers were harmed in several ways:

a. Earlier and Greater Payout of Death Benefit: It was a standard assumption of the Life Insurance Providers that, notwithstanding other factors, an individual with a high net worth would maintain a healthier lifestyle, receive better medical care and, consequently, live longer than an individual with minimal net worth. Typically, the longer an insured lives, the more income that a life insurance company realizes. Accordingly, the fraudulent inflation of an individual's net worth in an effort to secure a high-value universal life policy negatively impacted the Life Insurance Providers in two ways. First, an insured's life that was likely to end earlier than the Provider expected resulted in less income from premium payments to the Provider and an earlier payout of a death benefit. Second, misrepresentations regarding insureds' net worths caused Providers to approve – and later pay out – larger death benefits than they otherwise would have approved.

b. Less Premium Income: As discussed in this Information, a distinguishing feature of a typical universal life policy was an insured's ability to pay premiums in amounts that exceeded the minimum necessary to sustain the policy. Aside from allowing the insured to

realize tax-free growth, these additional premium amounts typically supplied the Life Insurance Providers with significant increased capital and profit. By contrast, a policy held or funded by a third-party investor often would be funded at or near the minimum premium necessary to sustain the policy. As a result, the Life Insurance Providers received less income than expected from universal life policies when, unbeknownst to the Life Insurance Providers at the time of issuance, investors and other third parties held an interest.

c.      Providers' Financial Projections Rendered Unreliable: The Life Insurance Providers assumed, and built into their pricing, the fact that a certain proportion of insureds would voluntarily terminate their policies, either by surrendering them or allowing them to lapse (i.e., fail to pay the required premiums). In contrast, third-party investors who secretly funded and/or owned policies normally did not allow policies to lapse, or did so based on different considerations than insureds. Therefore, the Providers could not accurately assess the voluntary termination rate for universal life insurance policies financed and/or owned by third-party investors. Thus, misrepresentations by agents and applicants regarding the existence of third-party premium financing and/or an insured's intent to resell universal life policies to investors undermined actuarial assumptions and financial planning that the Providers used to price their policies.

d.      Delayed Payments Causing Decreased Cash Flow: Third-party funders and investors typically took advantage of grace periods and other features that permitted late payments of premiums with greater frequency than insured persons. As a result, in addition to not receiving expected income from higher than required premium payments, the premium payments that the Life Insurance Providers did receive from investor-funded or -owned universal life policies were typically received later in the payment periods than policies paid

for by an actual insured. Accordingly, the cash flow available from those payments decreased where, unbeknownst to the Providers, investors funded and/or owned universal life policies they had issued.

e. Payout of Large Commissions: The issuance of large universal life insurance policies typically called for Life Insurance Providers to pay significant commissions to insurance agents, often a large percentage, if not the entirety, of the first year's premium. The Providers were able to pay such large commissions based in part on the revenue they expected to generate from the policies. In STOLI cases, where the expected revenue was diminished in several ways unbeknownst to the Providers, agents typically received commissions that were far in excess of what was justified by the policies.

15. To prevent against the harms described above, at all times relevant to this Information, the Providers took substantial steps and incurred significant additional underwriting, investigation and litigation expenses in attempting to detect and prevent the issuance and maintenance of STOLI policies. Nonetheless, the payment of large commissions created incentives for some agents to mislead the Providers regarding STOLI policies, since the agents generally knew that the Providers would not have issued the policies had they known the true intent of the insured and/or policy owner.

Background on Welfare Benefit Plans

16. In some cases, life insurance policies may be purchased through an "employee welfare benefit plan." As it applies to this Information, a single-employer employee welfare benefit plan is comprised of a single employer that provides one or more welfare benefits, including death benefits, to designated employees. Typically, a welfare benefit plan provides a death benefit through the purchase of a life insurance policy on the life of the participating

employee, and for the benefit of that employee's designated beneficiaries. All assets of an employee welfare benefit plan, including insurance policies, must be held in a trust.

17. In some cases, a "plan promoter" may market an employee welfare benefit plan to multiple unrelated employers wherein each employer may separately adopt that plan for the benefit of one or more of that employer's individual employees. This type of plan may be referred to as a "multiple employer welfare plan," a "multiple employer trust," or a "multiple employer welfare arrangement." In the case of pre-retirement death-benefit-only plans (or "DBO" plans), an adopting employer may designate the purchase of life insurance through the plan for the benefit of that employer's employees and their beneficiaries, while the plan sponsor or promoter administers the plan on behalf of the adopting employers. The plan promoter creates a trust for the purpose of holding plan assets, which, in a DBO plan, includes the life insurance policies on the lives of the participating employees.

18. In a DBO plan, the trust acts as owner and beneficiary of the life insurance policy. A participating employer must pay the required premiums to the trust, which in turn must forward the premiums to the insurance company. Then, should the employee die, the death benefit would be passed from the insurance company to the trust, and then from the trust to the employee's beneficiary. The plan promoter is typically paid an administration fee by the participating employers.

19. Sections 419 and 419A of the Internal Revenue Code of 1986 ("IRC") regulate the tax treatment of "funded welfare benefit plans." IRC Section 419(e) defines a welfare benefit fund as "any fund which is part of a plan of an employer, and through which the employer provides welfare benefits to employees or their beneficiaries." Such plans are commonly referred to as "419(e) plans."

## The Creation of the Plan and Trust

20.    In or about October 2006, a Subject Entity headquartered at the Simsbury Office (the "Plan Sponsor") established a welfare benefit plan and trust, hereinafter "the Plan" and "the Trust." According to the Declaration of Trust (the "Declaration"), the Trust was a "multiple employer trust that provides death benefits to certain specific covered individuals." The Declaration further stated that the Trust "is administered in conformity with all rules under Section 419 and 419A of the Internal Revenue Code of 1986…"

21.    The Plan purported to be a multiple employer welfare benefit plan that provided death benefits to the employees of employers who adopted the Plan. According to Plan related documents, an adopting employer designates one or more employees ("participating employees") on whom the Trust may purchase life insurance policies. The employer was required to pay to the Trust the cost of the insurance premiums, as well as a periodic administration fee, and the Trust would be the "owner" of the policy. Each participating employee was permitted to designate a beneficiary, to whom a death benefit would be paid upon the death of the participating employee. The death benefit was to be funded by the life insurance policy that was purchased on the life of the employee.

22.    The Trust and Plan were marketed by WAESCHE and others working with and/or for several of the Subject Entities.

## The Scheme to Defraud the Life Insurance Providers

23.    From in or about 2006 up to and including 2013, WAESCHE and others known and unknown to the Acting United States Attorney engaged in a scheme and artifice to defraud the Life Insurance Providers and to obtain money and property from the Life Insurance Providers by means of materially false and fraudulent representations regarding the purpose of insurance

10

policies purchased in the Plan and Trust, the income and net worth of applicants, the presence of premium financing, and the intent of the applicant to sell the policy, in order to induce the Life Insurance Providers to issue life insurance policies in reliance upon such false and misleading information.

24.     The scheme typically worked as follows: WAESCHE, and insurance agents working for or on behalf of the Subject Entities, recruited elderly clients (the "Straw Insureds") to participate in the Plan and apply for universal life insurance policies to be placed within the Trust. Usually, the Straw Insureds were offered the promise of free life insurance for two years, after which the plan promoters would sell the policy, and provide a share of the proceeds to the Straw Insured. In some cases, the Straw Insured was offered a financial inducement to participate. The Straw Insured was not obligated to pay anything; he/she was commonly told that the premiums were being borrowed from a third party source, and that the fees for the premium loan would be paid out of the proceeds from the sale or, if the Straw Insured died within two years, the death benefit.

25.     Although the Plan and Trust claimed to be an IRC § 419(e) multiple employer plan, WAESCHE and/or other agents rarely explained this aspect to the Straw Insureds. While some Straw Insureds had pre-existing companies that could be used as "employers" to enroll in the Plan and Trust, in other cases WAESCHE and/or other agents would assist the Straw Insured in creating a "paper" company for the purpose of enrolling in the Plan and Trust, with the Straw Insured designated as the participating employee. In some cases the paper company would be created without the knowledge, approval, and/or understanding of the Straw Insured.

26.     Once a Straw Insured agreed to enroll in the Plan and Trust, WAESCHE and/or another agent filled out or caused to be filled out an insurance application that contained one or

more material misrepresentations. Those misrepresentations were made both on the insurance applications as well as documents that were required to be completed by the insurance agent, often called the "agent's report" or "producer's report." For example:

a. WAESCHE and/or another insurance agent falsely verified that there would be no third-party financing of premiums;

b. WAESCHE and/or another insurance agent falsely verified that the Straw Insured and/or owner had no intent to sell, or had not engaged in discussion regarding the sale of, the policy;

c. WAESCHE and/or another insurance agent falsely verified that the policy was being purchased for estate planning related purposes;

d. WAESCHE and/or another insurance agent often falsely inflated the net worth and/or income of the Straw Insured; and

e. WAESCHE and/or another insurance agent often falsely claimed that no life expectancy reports had been performed, or would be performed, on the Straw Insured.

27. Each insurance application submitted by WAESCHE and/or others to the Providers, in connection with the Plan and Trust, indicated that the Plan and Trust was an IRC § 419(e) multiple employer plan, as described earlier in this Information. The Plan also required the Straw Insureds to complete certain forms created by the Subject Entities whereby the Straw Insured and his/her "Employer" agreed to participate in the Plan and Trust (the "Enrollment Forms"). The Enrollment Forms included an Adoption Agreement, whereby the Employer adopted the Plan and listed the employee (Straw Insured) to be insured; the "Election of Participation and Beneficiary Designation Form," hereinafter the "Election Form," where an individual employee (Straw Insured) enrolled in the Plan and elected a beneficiary for the life

insurance to be purchased; and a "Certificate of Resolution," under which the Employer "approves, adopts, and agrees to make contributions to and fund benefits for certain employees through the [Plan and Trust], a Welfare Benefit Fund as described under Internal Revenue Code Section 419(e)."

28. In truth and in fact, and as WAESCHE well knew, no Employer or Straw Insured ever paid a premium into the Trust; rather, all premiums were funded by loans. Those loans came to the Trust from another company headquartered at the Simsbury Offices ("the Funding Entity"), and in many cases the Funding Entity in turn borrowed the funds from another third party financing source (the "Outside Funder"). The loan agreements provided for no recourse for either the Funding Entity or the Outside Funder against the assets of any Starw Insured; in other words, the Straw Insured had no obligation to repay the loan, except from proceeds of a sale of the policy or payment of a death benefit. Finally, each policy was procured with the primary intent to resell that policy, typically following the expiration of the two-year contestable period.

29. In order to secure funding from the Outside Funder for payment of premiums, unbeknownst to the Providers, the Funding Entity entered into a Line of Credit Grid Promissory Note (the "Outside Loan Agreement") with the Outside Funder, which called for a $35 million line of credit from the Outside Funder, to be repaid with interest not to exceed 16%. Under the Outside Loan Agreement, the Funding Entity was entitled to seek funding for insurance premiums for policies to be placed in the Plan and Trust, through 27-month loans from the Outside Funder.

30. In every case, whether or not funds came originally from the Outside Funder, the Funding Entity loaned money to the Trust for payment of premiums. In some cases, especially

those where money had originated from the Outside Funder, the loan from the Funding Entity to the Trust was documented in a Funding Obligation Agreement and Power of Attorney (the "Loan Agreement") between the Trust and the Funding Entity. The Loan Agreement obligated the Trust to repay the loan principal in addition to an origination fee (stated as a percentage of money borrowed) and a placement fee (stated as a percentage of the death benefit).

31.    In all cases, the loan agreement between the Trust and the Funding Entity was reflected in a "Disclosure, Acknowledgement, and Certification Agreement," hereinafter the DAC Agreement, which was one of the Enrollment Forms. In the DAC Agreement, the Straw Insured and the agent acknowledged the existence of a loan agreement between the Funding Entity and the Trust. Among other terms, the DAC Agreement reflected an obligation that, upon the "maturation, disposition, or termination" of a Plan insurance policy, the Funding Entity must be paid back the money it lent for the premiums, in addition to an origination fee (stated as a percentage of money borrowed) and a placement fee (stated as a percentage of the death benefit).

32.    It was part of the scheme and artifice to defraud that neither the DAC Agreement nor any other loan documentation was given to the Provider.

33.    It was also part of the scheme and artifice to defraud that the loan amount was approximately twice the amount of the premiums borrowed by the end of the second year. Although the Plan documents allowed for the Straw Insured to purchase the policy at the end of two years, nearly all Straw Insureds had no intention of doing so, and in any event the loan terms made it cost prohibitive.

34.    It was also part of the scheme and artifice to defraud that WAESCHE, and other co-conspirators not charged herein, misrepresented to the Providers that the Trust was a bona fide multiple employer welfare benefit trust or arrangement falling under Section 419(e) of the

Internal Revenue Code, when in truth and in fact, and as WAESCHE and his co-conspirators well knew, the welfare benefit plan structure was designed to hide the true intent of the conspirators and to imply falsely an insurable interest where one did not exist.

35.  Each of these and other misrepresentations by WAESCHE and his co-conspirators were material to and concerned essential elements of the bargains between (a) the Life Insurance Providers, the Plan and Trust, and the Straw Insureds with respect to the policies at issue, and (b) the Life Insurance Providers, WAESCHE, and the Subject Entities with respect to commissions that the Life Insurance Providers paid to WAESCHE and the Subject Entities. As detailed in this Information, the misrepresentations by WAESCHE and others known and unknown created discrepancies between the benefits that the Life Insurance Providers reasonably anticipated from issuing the policies at issue and paying the accompanying millions of dollars in commissions to WAESCHE and others working with and/or on behalf of the Subject Entities, and the actual benefits that the Providers received in doing so.

<u>Straw Insureds</u>

36.  By way of example, several of the Straw Insureds are discussed below.

37.  Straw Insured-A ("SI-A"), a then 73-year-old male resident of Connecticut, first met WAESCHE in 2007. WAESCHE spoke to SI-A at SI-A's house, and offered to insure SI-A for between two and five million dollars, with the premiums to be paid by a third party. For the first two years, SI-A's family would be the beneficiary of the policy, and would receive any death benefit, less premiums and certain fees. WAESCHE told SI-A that, after two years, he would check SI-A's life expectancy and would attempt to sell the policy to private investors. WAESCHE told SI-A he would receive whatever was left from the sale after premiums and fees were repaid.

38.     In or about 2007 and 2008, WAESCHE filled out, signed, and caused to be submitted, insurance applications on behalf of SI-A, with Phoenix, and Penn Mutual, through the Plan and Trust.  Those applications included material misrepresentations, including falsely denying the existence of third party funding of premiums, falsely denying the insured's intent to sell the policy, falsely giving the purpose of the insurance as "estate tax liquidity" and "wealth transfer," and falsely inflating the net worth and income of SI-A.

39.     Straw Insured-B ("SI-B"), a then 76-year-old female and her husband, Straw Insured-C ("SI-C"), a then 83-year-old male, both residents of New York, were first introduced to WAESCHE in 2007.  WAESCHE offered to purchase life insurance for SI-B and/or SI-C, at no cost for two years, and then to sell the policy or policies at the end of two years.  In or about 2007 and 2008, WAESCHE filled out, signed, and caused to be submitted, insurance applications on behalf of both SI-B and SI-C, with LINCOLN, Phoenix, and Penn Mutual, through the Plan and Trust.  Those applications included material misrepresentations, including falsely denying the existence of third party funding of premiums, falsely denying the insured's intent to sell the policy, falsely giving the purpose of the insurance as "estate tax liquidity" and "wealth transfer," and falsely inflating the net worth and income of SI-B and SI-C.

40.     In or about 2008, Straw Insured-D ("SI-D"), a then 77-year-old female resident of California, was approached by individuals who offered to pay her in exchange for purchasing insurance on her life.  In May 2008, WAESCHE filled out and signed a life insurance application with Penn Mutual on the life of SI-D, to be owned by the Trust. The application contained material misrepresentations, including falsely denying the existence of third party funding of premiums, falsely denying the possibility that the policy may be sold, falsely giving the purpose · of the insurance as "estate tax liquidity," and falsely inflating the net worth and income of SI-D.

41.     In or about 2008, Straw Insured-E ("SI-E"), a then 74-year-old female resident of Arizona, was informed of a plan under which insurance could be purchased on her life at no cost, and that she could receive a financial benefit as a result. SI-E contacted an individual, and signed forms in order to enroll in the Plan and Trust. In or about March 2008, WAESCHE filled out and signed a life insurance application with Phoenix on the life of SI-E, to be owned by the Trust. The application contained material misrepresentations, including falsely denying the existence of third party funding of premiums, falsely denying the possibility that the policy may be sold, falsely giving the purpose of the insurance as "estate tax liquidity" and "wealth transfer," and falsely inflating the net worth and income of SI-E.

42.     In or about 2008, Straw Insured-F ("SI-F"), a then 71-year-old female resident of Arizona, received information about an opportunity to permit an investor to purchase life insurance on SI-F's life, wherein the investor would pay the premiums and may at some point provide compensation to SI-F. In or about October 2008, WAESCHE filled out and signed a life insurance application with LINCOLN on the life of SI-F, to be owned by the Trust. The application contained material misrepresentations, including falsely denying the existence of third party funding of premiums, falsely denying the possibility that the policy may be sold, falsely giving the purpose of the insurance as "estate tax liquidity" and "wealth transfer," and falsely inflating the net worth and income of SI-F.

## Use of the Mails and Wires

43.     It was a part of the scheme to defraud that WAESCHE and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, for the purpose of executing such scheme and artifice, would and

did place in a post office and authorized depository for mail matters and things, to be sent and delivered by the Postal Service, and deposited and caused to be deposited matters and things to be sent and delivered by private and commercial interstate carriers, and did take and receive therefrom, such matters and things, and knowingly caused to be delivered by mail and such carriers according to the direction thereon, and at the place it was directed to be delivered by the person to whom it was addressed, such matters and things, in violation of Title 18, United States Code, Section 1341.

44.     It was further a part of the scheme to defraud that WAESCHE and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

## The Conspiracy

45.     From at least in or about 2006, up to and including in or about 2013, in the District of Connecticut and elsewhere, WAESCHE and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit mail and wire fraud as described above, in violation of Title 18, United States Code, Sections 1341 and 1343.

## Manner and Means of the Conspiracy

46.     The manner and means by which WAESCHE and his co-conspirators sought to accomplish the purposes of the conspiracy included, among other things, the following:

47.     WAESCHE, and/or other co-conspirators, would and did recruit Straw Insureds to participate in the Plan to apply for universal life insurance policies to be placed within the Trust.

48.     WAESCHE, and/or other co-conspirators, would and did offer to Straw Insureds the promise of free life insurance for two years, after which WAESCHE and/or other co-conspirators would attempt to sell the policy, and provide a share of the proceeds to the Straw Insured. The Straw Insured was not obligated to pay anything; he/she was commonly told that the premiums were being borrowed from a third party source, and that the fees for the premium loan would be paid for out of the proceeds from the sale or, if the Straw Insured died within two years, the death benefit.

49.     WAESCHE, and/or other co-conspirators, would and did cause to be submitted to the Providers insurance applications containing materially false and misleading information regarding, among other things, the existence of third-party payment of premiums and the intent to sell the policy, with the intent to induce fraudulently the Providers to issue insurance policies on the lives of the Straw Insureds.

50.     WAESCHE, and/or other co-conspirators, would and did fail to disclose to the Providers any information or documentation regarding premium funding arrangements between the Trust, the Straw Insureds, the Employers, the Funding Entity, and/or the Outside Funder, with the purpose of hiding the existence of such arrangements from the Providers.

51.     WAESCHE, and/or other co-conspirators, would and did regularly receive large commissions from the Providers as a result of the issuance of insurance policies on the lives of the Straw Insureds.

52.     WAESCHE, and/or other co-conspirators, would and did take steps to attempt to sell several of the life insurance policies to life settlement investment funds or brokers.

<u>Overt Acts</u>

53.     In furtherance of the conspiracy and to achieve the objects thereof, at least one of the co-conspirators committed or caused to be committed, in the District of Connecticut, and elsewhere, at least one of the following overt acts, among others:

54.     On or about August 20, 2010, WAESCHE sent an email to a representative of a life settlement brokerage in New Jersey, with the intent to sell the policy on SI-A's life.

55.     On or about July 3, 2008, WAESCHE knowingly caused to be sent and delivered by a private and commercial interstate carrier, to Penn Mutual, an insurance application on the life of SI-B, along with associated documents, containing material misrepresentations, including: on the insured's application, answering the question "have you been involved in any discussion about the possible sale or assignment of this policy to a Life Settlement, Viatical or other secondary market provider?" by checking the box labeled "NO;" on the Agent's Underwriting Report, answering the question "will any part of the premium be paid for by funds that are borrowed or otherwise financed" by checking the box labeled "No;" on the Agent's Underwriting Report, answering the question "what is the specific need for this coverage?" with the phrase "Estate tax liquidity, wealth transfer;" and on the Agent's Underwriting Report, answering the question "have you had any discussions about, or do you have any reason to believe that this policy may be sold or assigned to a Life Settlement, Viatical or other secondary market provider?" by checking the box labeled "No."

56.     On or about July 2, 2008, WAESCHE sent an email to a representative of Penn Mutual that contained material misrepresentations in connection with an insurance application submitted on the life of SI-B, including the statement "[SI-B and SI-C] recently sat down with [SI-C's] advisor(s) to do his estate planning and agreed that providing the death benefit

protection through a welfare benefit DBO Plan fit in best with their personal and business estate planning goals and objectives."

57.     On or about January 24, 2008, WAESCHE sent an email to a representative of LINCOLN that contained material misrepresentations in connection with an insurance application submitted on the life of SI-C, including the statement: "The client has both earned and unearned income well in excess of $500[,000]. It will be partly form (sic) that as well as trust assets that will be used to fund the life insurance protection."

58.     On or about June 26, 2008, WAESCHE knowingly caused to be sent and delivered by a private and commercial interstate carrier, to Penn Mutual, the aforementioned insurance application on the life of SI-D, along with related documents, containing material misrepresentations, including the following statement: "[SI-D] has done well and has planned accordingly; however, she may face a sizable tax liability at her death. [SI-D] sees that a sound life insurance strategy is her best course of action. She also understands that at her age and profile, this is likely the last time she can secure insurance coverage that is not cost prohibitive. Some of the income, dividends and interest from [SI-D]'s trust assets will pay for the cost of insurance to offset the future tax liability."

59.     On or about April 11, 2008, WAESCHE knowingly caused to be sent and delivered by a private and commercial interstate carrier, to Phoenix, the aforementioned insurance application on the life of SI-E, along with related documents, containing material misrepresentations, including the following answers on the insured's application: answering the question "will any of the first year or subsequent premiums for the policy be borrowed by the proposed owner or proposed insured or by any other individual, trust, partnership, corporation or similar or related entity?" by checking the box labeled "No;" answering the question "will the

owner, now or in the future pay premiums funded by an individual and/or entity other than the proposed insured?" by checking the box labeled "No;" answering the question "is the policy being purchased in connection with any formal or informal program under which the proposed owner or proposed insured have been advised of the opportunity to transfer the policy to a third party within five years of its issuance?" by checking the box labeled "No;" and answering the directive to "state in detail what bona fide need the proposed owner or proposed insured has for insurance" with the statement "estate tax liquidity, wealth transfer."

60.     On or about November 7, 2008, WAESCHE knowingly caused to be sent and delivered by a private and commercial interstate carrier, to LINCOLN, the aforementioned insurance application on the life of SI-F, along with related documents, containing material misrepresentations, including the following statement: "[SI-F] has done well and has planned accordingly; however, she may face a sizable tax liability at her death. [SI-F] sees that a sound life insurance strategy is her best recourse. [SI-F] also understands that at her age and profile, this is likely the last time she can secure insurance coverage that isn't cost prohibitive. Earnings from [SI-F]'s Trust will pay for the cost of insurance necessary to offset the future tax liability."

61.     On or about November 18, 2008, WAESCHE sent an email to a representative of LINCOLN that contained material misrepresentations in connection with an insurance application submitted on the life of SI-F, concerning the income and net worth of SI-F and concerning the source of premiums, including the following statements: "At present, [SI-F]'s net worth is approximately $7,800,000....The funds necessary to pay the premium will come from interest, dividends, capital gains and appreciation from her trust assets."

All in violation of Title 18, United States Code, Section 371.

UNITED STATES OF AMERICA

DEIRDRE M. DALY
ACTING UNITED STATES ATTORNEY

DAVID E. NOVICK
ASSISTANT UNITED STATES ATTORNEY

NEERAJ N. PATEL
ASSISTANT UNITED STATES ATTORNEY